OPINION
 

 Per Curiam:
 

 Petitioner Ivan Miller challenges newly enacted NRS 213.085,
 
 [1]
 
 
 *932
 
 which applies retroactively to first-degree murderers already sentenced to life imprisonment without the possibility of parole, on the ground that it constitutes an unconstitutional
 
 ex post facto
 
 law. We agree that the retroactivity provision is unconstitutional. We therefore issue the writ declaring NRS 213.085(1) invalid to the extent that it applies retroactively.
 

 FACTS
 

 In 1983, petitioner Ivan Miller pleaded guilty to first-degree murder. He was sentenced in Nevada district court to life in the Nevada State Prison without the possibility of parole. In 1995, the Nevada Legislature passed NRS 213.085, which revoked the power of the Pardons Board to commute a sentence of life without the possibility of parole to a sentence that would allow parole. The new law took effect July 1, 1995, and applies retroactively to anyone presently serving a “life without” sentence for first-degree murder. In August of 1995, the Pardons Board heard and denied Miller’s application for commutation of his sentence to life with the possibility of parole. Miller now petitions this court for a writ ordering the Pardons Board to consider his application for commutation without regard to newly enacted NRS 213.085. Miller contends that NRS 213.085, to the extent it applies retroactively, violates the Ex Post Facto Clause of the federal and state constitutions. Miller also contends that, irrespective of the statute’s retroactive aspect, NRS 213.085 violates the Cruel and Unusual Punishment, Due Process, and Equal Protection clauses of the federal constitution.
 

 DISCUSSION
 

 Ex Post Facto Clause
 

 Article I, section 10, clause 1 of the United States Constitution forbids the states from passing any “ex post facto Law.” The Framers of the Constitution viewed the prohibition on
 
 ex post facto
 
 legislation as one of the fundamental protections against arbitrary and oppressive government. Cal. Dept. of Corrections v. Morales, 514 U.S. ....., 115 S. Ct. 1597, 1606 (1995)
 
 *933
 
 (Stevens, J., dissenting) (quoting The Federalist No. 44, p. 282 (C. Rossiter, ed. 1961)). The United States Supreme Court has held that the clause is aimed at laws that “retroactively alter the definition of crimes or increase the punishment for criminal acts.” Collins v. Youngblood, 497 U.S. 37, 41 (1990) (citing Calder v. Bull, 3 U.S. (3 Dall.) 386, 391-392 (1798) (opinion of Chase, J.)),
 
 quoted in
 
 Cal. Dept. of Corrections v. Morales, 514 U.S. ...., 115 S. Ct. 1597, 1601 (1995).
 
 [2]
 
 At issue in this case is whether NRS 213.085(1), which applies retroactively to those convicted of first-degree murder, implicates this latter aspect of the Ex Post Facto Clause, the prohibition against laws that retroactively increase the punishment for criminal acts.
 

 Both parties rely extensively on California Dept. of Corrections v. Morales, 514 U.S. ....., 115 S. Ct. 1597 (1995), in which the United States Supreme Court recently sustained an amended California statute against an Ex Post Facto Clause challenge. Under the law in place at the time Morales committed his crimes, he would have been entitled, after his first parole suitability hearing, to subsequent suitability hearings on an annual basis.
 
 Id.
 
 at ....., 115 S. Ct. at 1600. Under the amended statute, however, the Board of Prison Terms is authorized to defer subsequent suitability hearings for up to three years if the Board finds that it is not reasonable to expect that parole would be granted at a hearing during the years for which suitability hearings are deferred.
 
 Id.
 
 at ....., 115 S. Ct. at 1600.
 

 In
 
 Morales,
 
 the Court noted that there is no clear formula for determining whether a statute stiffens the “standard of punishment” applicable to a particular crime.
 
 Id.
 
 at ....., 115 S. Ct. at 1603. Rather, the Court noted, the question is a matter of “‘degree.’”
 
 Id.
 
 at ....., 115 S. Ct. at 1603 (quoting Beazell v. Ohio, 269 U.S. 167, 171 (1925)). The Court concluded that “the California legislation at issue creates only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes.”
 
 Id.
 
 at ...., 115 S. Ct. at 1605. According to the Court, “such conjectural effects are insufficient
 
 *934
 
 under any threshold we might establish under the
 
 Ex Post Facto
 
 Clause.”
 
 Id.
 
 at ...., 115 S. Ct. at 1603.
 

 First, the Court reasoned that the amendment applies only to a class of prisoners for whom the likelihood of release on parole is quite remote and that the amendment was seen by the legislature as a way “‘to relieve the [Board] of the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released.’ ”
 
 Id.
 
 at ...., 115 S. Ct. at 1603-04 (quoting In re Jackson, 703 P.2d 100, 105 (Cal. 1985) (quoting legislative history)). Second, the Court reasoned that the amendment was “carefully tailored” to that purpose.
 
 Id.
 
 at ....., 115 S. Ct. at 1604. As the Court noted:
 

 In light of the particularized findings required under the amendment and the broad discretion given to the Board, the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings.
 
 For these prisoners, the amendment simply allows the Board to avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis.
 

 Id.
 
 at ...., 115 S. Ct. at 1604 (emphasis added). Finally, the Court rejected the argument that there was some chance that the amendment might nevertheless produce an increased term of confinement for some prisoners who might experience a change of circumstances that could render them suitable for parole during the period between their hearings.
 
 Id.
 
 at ...., 115 S. Ct. at 1604. The Court noted that, because of the continuing possibility of an expedited suitability hearing and the normal delay between a suitability determination and actual parole,
 
 “[s]uch a prisoner’s ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings.” Id.
 
 at ...., 115 S. Ct. at 1605 (emphasis added). The bottom line in
 
 Morales
 
 is that the challenged provision was unlikely to affect the actual term of confinement for any prisoner to whom it was applicable.
 

 Miller contends that eliminating the possibility of commutation to “life with” increases the measure of punishment for first-degree murder. We agree. Absolutely foreclosing a real, albeit rare, avenue of release to all prisoners serving sentences of “life without” for the crime of first-degree murder creates more than a speculative or attenuated risk of increasing the penalty for this covered crime.
 

 The State misinterprets
 
 Morales
 
 by arguing that NRS 213.085(1) is valid because the limitation on the commutation of
 
 *935
 
 the Pardons Board “applies only to a class of prisoners for whom the chance of release ... is quite remote.” Although the United States Supreme Court made a similar observation regarding the challenged amendment in
 
 Morales,
 
 more importantly, the Court reasoned that the amendment also gave the Board the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner. Morales, ..... U.S. at ...., 115 S. Ct. at 1604. Thus, from among the already-narrow class of prisoners covered by the amendment, the Board was only allowed to eliminate annual parole hearings for those prisoners for whom there was “no reasonable chance of being released” so as to “avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis.”
 
 Id.
 
 at ...., 115 S. Ct. at 1604. In the present case, there is no such further winnowing of the narrow class of first-degree murderers serving sentences of life without the possibility of parole. NRS 213.085(1) denies these prisoners the right to seek commutation without regard to whether or not their applications may have been “futile.”
 

 Furthermore, as Miller points out, the Nevada Board of Pardons has commuted life sentences to include the possibility of parole on a fairly regular basis.
 
 See
 
 Sumner v. Shuman, 483 U.S. 66, 83-84 n. 11 (1987) (“life without the possibility of parole may not ultimately mean in Nevada what it seems to say” because, since 1975, more than twenty persons sentenced to life without have been granted the possibility of parole). In fact, we take judicial notice that, since 1974, the Pardons Board has on twenty-seven occasions commuted a sentence of “life without” to a sentence of “life with.” Of these twenty-seven commuted sentences, twenty-six were for the crime of first-degree murder. We conclude that the statistics cited above demonstrate that the possibility of commutation — for at least some first-degree murderers— is real rather than merely theoretical or speculative or attenuated.
 

 Moreover, Miller is not required to prove that he personally would have had his sentence commuted but for the operation of NRS 213.085(1). As the Court stated in Weaver v. Graham, 450 U.S. 24 (1981), “[t]he inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual.” 450 U.S. at 33. This approach is also implicit in
 
 Morales,
 
 which focused not on whether the California amendment affected Morales’ measure of punishment personally, but whether it affected the measure of punishment of
 
 *936
 
 anyone at whom the amendment was directed.
 
 [3]
 
 Thus, although the possibility of commutation may be speculative as to Miller, as Amicus Clark County argues, emphasis of this fact misses the proper focus of this inquiry — the more-than-speculative effect of the challenged provision on the covered crime of first-degree murder.
 
 [4]
 

 Finally, we reject the State’s contention that NRS 213.085(1) is valid because the Pardons Board retains the power to grant clemency through pardon. The State’s argument assumes that the power to pardon and the power to commute are functionally equivalent in terms of their likely impact on a first-degree murderer’s sentence. We note that, although the Pardons Board has, since 1974, commuted twenty-seven “life without” sentences for first-degree murder to sentences that would allow parole, not once during this period has it granted a pardon to someone serving a sentence of life without the possibility of parole. Moreover, we cannot accept, as suggested by the State during oral argument, that the Pardons Board can mitigate the punitive effects
 
 *937
 
 of NRS 213.085 by simply shifting their modus operandi to the granting of “conditional pardons” allowing for deferred release dates and supervision by parole authorities. We believe that the legislature intended more than simply to remove the parole boards from the clemency process. We conclude that the State’s interpretation of NRS 213.085(1) would render the statute a nullity, a result that could not have been the intent of the legislature in adopting NRS 213.085.
 
 [5]
 

 Justiciability
 

 Amicus contends that Miller’s challenge to NRS 213.085(1) is not ripe for review because there is no indication that the Pardons Board denied Miller’s application for commutation based upon the newly adopted statute. We disagree. The Board heard and denied Miller’s application after NRS 213.085(1) became effective. We presume that the Pardons Board knew the law and applied it in making their decision.
 
 Cf.
 
 Jones v. State, 107 Nev. 632, 636, 817 P.2d 1179, 1181 (1991) (“trial judges are presumed to know the law and to apply it in making their decisions”) (citing Walton v. Arizona, 494 U.S. 639 (1990)).
 

 CONCLUSION
 

 For the reasons set forth above, we conclude that NRS 213.085(1) increases the measure of punishment for the covered crime of first-degree murder; therefore, to the extent that it applies retroactively, the statute violates the Ex Post Facto Clause of the United States Constitution. Accordingly, we issue the writ declaring the retroactivity provision of NRS 213.085(1) inopera
 
 *938
 
 tive; however, because the Nevada Board of Pardons is not a party to this action, we decline to order the Nevada Board of Pardons to reconsider Miller’s 1995 application for commutation.
 
 [6]
 

 [1]
 

 NRS 213.085, which became effective July 1, 1995, provides:
 

 1. If a person is convicted of murder of the first degree before, on or after July 1, 1995, the board shall not commute:
 

 
 *932
 
 (a) A sentence of death; or
 

 (b) A sentence of imprisonment in the state prison for life without the possibility of parole,
 

 to a sentence that would allow parole.
 

 2. If a person is convicted of any crime other than murder of the first degree on or after July 1, 1995, the board shall not commute:
 

 (a) A sentence of death; or
 

 (b) A sentence of imprisonment in the state prison for life without the possibility of parole,
 

 to a sentence that would allow parole.
 

 [2]
 

 See generally
 
 Miller v. Florida, 482 U.S. 423 (1987) (holding invalid statute that retroactively changed “presumptive sentencing range,” which court was required to follow in the absence of “clear and convincing reasons,” to allow for longer sentence); Weaver v. Graham, 450 U.S, 24 (1981) (holding invalid statute that retroactively reduced the amount of “gain time” credits available to prisoner under formula for mandatory reductions to the terms of all prisoners who complied with certain prison regulations and state laws); Lindsey v. Washington, 301 U.S. 397 (1937) (holding invalid sentencing guidelines providing for indeterminate sentence of “not more than fifteen years” retroactively changed to mandatory fifteen-year sentence with possibility of parole).
 

 [3]
 

 See also Miller v. Florida, 482 U.S. 423 (1987), in which the Supreme Court reaffirmed the holding in Lindsey v. Washington, 301 U.S. 397 (1937), that “one is not barred from challenging a change in the penal code on
 
 ex post facto
 
 grounds simply because the sentence he received under the new law was not more onerous than that which he might have received under the old.”
 
 Miller,
 
 482 U.S. at 432 (citations omitted).
 

 [4]
 

 According to Amicus Clark County, NRS 213.085(1) takes away only Miller’s “unsubstantiated
 
 hope
 
 that one day his sentence might be commuted to a sentence allowing parole and his further speculative hope that, if his sentence is commuted, the parole board might some day grant him parole.” Amicus appears to confuse the inquiry under the Ex Post Facto Clause with the concept of standing under Article III. The Supreme Court has established that the “irreducible constitutional minimum” of standing requires that a plaintiff have suffered an “injury in fact” that is not merely conjectural or hypothetical, that there be a causal connection between the injury and the conduct complained of, and that it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992). Standing is not properly in issue in this case, however, because Miller — regardless of what may be his own slim chance of having his sentence commuted — has been denied the opportunity to even have his petition considered on its merits. As the United States Supreme Court noted in
 
 Lujan:
 

 The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency’s failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.
 

 504 U.S. at 572 n.7.
 

 [6]
 

 Because our discussion of the Ex Post Facto Clause issue disposes of this case, we need not consider Miller’s additional contentions.
 

 [5]
 

 In fact, the legislative history reflects a belief that NRS 213.085 was necessary to send a message to potential criminals that “life without the possibility of parole” means just that. For example, the Minutes of the Assembly Committee on Judiciary, May 18, 1995, at page 4, record the following discussion:
 

 Mr. Carpenter asked if life without the possibility of parole will mean life without the possibility of parole. Senator James answered affirmatively. Senator James elaborated further that when someone commits a murder now they do not believe they will truly be incarcerated for life.
 

 . . . The power of setting forth that life without the possibility of parole means just that is the deterrent needed throughout the system. Under S.B. 416 that sentence could not be commuted by the pardon’s board.
 

 See Hotel Employees
 
 v.
 
 State Gaming Control Board,
 
 103 Nev. 588, 592, 747 P.2d 878, 880 (1987) (“public records on file in the research library of the Legislative Counsel Bureau” may properly be examined in determining legislative intent). Obviously, if the powers of commutation and pardon were interchangeable the intended deterrent effect of the statutory amendment would be substantially vitiated.